No. 13-10439-FF

In the
United States Court of Appeals
for the Eleventh Circuit

CHARLES FRIEDLANDER,
*Movant-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NOS. 8:08-CR-318-T-27TGW & 8:12-CV-723-T-27TGW

**BRIEF OF THE UNITED STATES**

A. LEE BENTLEY, III
Acting United States Attorney

SUSAN H. ROTHSTEIN-YOUAKIM
Assistant United States Attorney
Appellate Division

TODD B. GRANDY
Assistant United States Attorney
Appellate Division
Florida Bar No. 992674
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

November 26, 2013

*Friedlander v. United States*
No. 13-10439-FF

## Certificate of Interested Persons
## and Corporate Disclosure Statement

In addition to the persons identified in the certificate of interested persons and corporate disclosure statement in Charles Friedlander's principal brief, the following persons have an interest in the outcome of this case:

1. Bentley, A. Lee, III, Acting United States Attorney;

2. Edelstein, Jonathan I., Esq.;

3. Ellis, Alan, Esq.;

4. Friedlander, Charles, petitioner-appellant;

5. Grandy, Todd B., Assistant United States Attorney;

6. Kaiser, Amanda C., Assistant United States Attorney;

7. Martinez, Victor D., Esq.;

8. O'Neill, Robert E., former United States Attorney;

9. Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

10. Rothstein-Youakim, Susan H., Assistant United States Attorney;

11. Sartes, Peter A., Esq.;

12. Tragos, George E., Esq.;

13.    Whittemore, Hon. James D., United States District Judge; and

14.    Wilson, Hon. Thomas G., United States Magistrate Judge.

## Statement Regarding Oral Argument

The United States does not request oral argument, as the record is clear and the issues on appeal are straightforward. *See* Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3(b)(3).

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement..........C-1

Statement Regarding Oral Argument ..............................................................i

Table of Contents .........................................................................................ii

Table of Citations ....................................................................................... iv

Statement of Jurisdiction ............................................................................ ix

Statement of the Issues ................................................................................ 1

Statement of the Case .................................................................................. 1

    *Course of Proceedings* ............................................................................ 2

    *Statement of the Facts*............................................................................ 4

    A.   Offense and other relevant conduct ............................................... 4

    B.   The *Daubert* hearing ................................................................... 7

    C.   Pertinent facts concerning Friedlander's sentencing ................... 10

    *Standard of Review* ............................................................................. 14

Summary of the Argument ......................................................................... 14

Argument and Citations of Authority ......................................................... 17

    I.   The district court correctly rejected Friedlander's argument
        that his counsel had been ineffective in their preparation of
        Dr. Berlin for the pretrial *Daubert* hearing in this case ................. 20

II.    The district court correctly determined that Friedlander's
       attorneys had not been ineffective in declining to present
       largely cumulative mitigating evidence during Friedlander's
       sentencing hearing ................................................................... 27

III.   The district court correctly determined that Friedlander's
       counsel had not been ineffective in declining to challenge
       on direct appeal the court's consideration of Friedlander's
       uncharged communications with Detective Spector as
       "relevant conduct" under USSG §1B1.3 .................................... 33

Conclusion................................................................................................ 40

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

iii

# Table of Citations

## Cases

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
  582 F.3d 1227 (11th Cir. 2009) ................................................................... 24

*Bolender v. Singletary*,
  16 F.3d 1547 (11th Cir. 1994) ............................................................... 35, 38

*Brooks v. Comm'r, Ala. Dep't of Corr.*,
  719 F.3d 1292 (11th Cir. 2013) ................................................................... 19

*\*Daubert v. Merrill Dow Pharm., Inc.*,
  509 U.S. at 597, 113 S. Ct. at 2799 .................................................. ix, 21–25

*\*Diaz v. Sec'y for the Dep't of Corr.*,
  402 F.3d 1136 (11th Cir. 2005) ............................................................. 35, 38

*Friedlander v. United States*,
  131 S. Ct. 1833 (2011) .................................................................................. 2

*Frye v. United States*,
  293 F. 1013 (D.C. Cir. 1923) ...................................................................... 21

*Harrington v. Richter*,
  131 S. Ct. 770 (2011) .................................................................................. 19

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
  609 F.3d 1183 (11th Cir. 2010) ................................................................... 24

*Holladay v. Haley*,
  209 F.3d 1243 (11th Cir. 2000) ................................................................... 22

*\*Johnson v. Alabama*,
  256 F.3d 1156 (11th Cir. 2001) ............................................................. 19, 28

*Jones v. Barnes*,
 463 U.S. 745–52, 103 S. Ct. 3308, (1983)................................................... 20

*Lee v. Comm'r, Ala. Dep't of Corr.*,
 726 F.3d 1172 .............................................................................................. 33

*Murray v. United States*,
 145 F.3d 1249 (11th Cir. 1998) ............................................................ x, 17

*Payne v. United States*,
 566 F.3d 1276 (11th Cir. 2009) ..........................................................14, 20

*\*Rhode v. Hall*,
 582 F.3d 1273 (11th Cir. 2009) ..................................................... 18, 28, 33

*Smith v. Robbins*,
 528 U.S. 259, 120 S. Ct. 746 (2000) ......................................................... 20

*\*Strickland v. Washington*,
 466 U.S. 668, 104 S. Ct. 2052 (1984) ................................ 17–19, 21, 22, 28

*Suggs v. McNeil*,
 609 F.3d 1218 (11th Cir. 2010) .................................................................. 28

*Thompson v. Haley*,
 255 F.3d 1292 (11th Cir. 2001) ...........................................................19, 28

*United Fire and Cas. Co. v. Whirlpool Corp.*,
 704 F.3d 1338 (11th Cir. 2013) ...........................................................22, 23

*United States v. Ahders*,
 622 F.3d 115 (2d Cir. 2010)................................................................37, 38

*United States v. Amedeo*,
 370 F.3d 1305 ............................................................................................... 39

*United States v. Behr*,
 93 F.3d 764 (11th Cir. 1996)...................................................................... 36

v

*United States v. Dunlap,
    279 F.3d 965 (11th Cir. 2002) ..............................................................37, 38

United States v. Friedlander,
    395 F. App'x 577 .........................................................................2, 24, 25

United States v. Gladish,
    536 F.3d 646 (7th Cir. 2008).......................................................... 24

United States v. Grauer,
    805 F. Supp. 2d 698 (S.D. Iowa 2011) ........................................ 24

United States v. Hofus,
    598 F.3d 1171 (9th Cir. 2010).......................................................... 24

United States v. Joseph,
    542 F.3d 13 (2d Cir. 2008) .............................................................. 24

*United States v. Lee,
    603 F.3d 904 (11th Cir. 2010) ...................................................... 35

United States v. Manley,
    893 F.2d 1221 (11th Cir. 1990)...................................................... 26

United States v. Nance,
    611 F.3d 409.................................................................................. 37

United States v. Nyhuis,
    211 F.3d 1340 (11th Cir. 2000)...................................................... 25

United States v. Powers,
    59 F.3d 1460.................................................................................. 27

*United States v. Rothenberg,
    610 F.3d 621 .................................................................................. 35

United States v. Stulock,
    308 F.3d 922 (8th Cir. 2002)........................................................ 37

vi

*United States v. Turner*,
  626 F.3d 566 (11th Cir. 2010)..............................................................34

*United States v. Valladares*,
  544 F.3d 1257 (11th Cir. 2008)............................................................36

*United States v. Wallenfang*,
  568 F.3d 649 (8th Cir. 2009)................................................................26

*United States v. Wernick*,
  691 F.3d 108..........................................................................................37

*United States v. Yost*,
  479 F.3d 815 (11th Cir. 2007)..............................................................34

*Wong v. Belmontes*,
  558 U.S. 15, 130 S. Ct. 383 (2009)......................................................28

**Statutes**

18 U.S.C. § 17(b)......................................................................................26

18 U.S.C. § 2422(b) ............................................................................2, 28

18 U.S.C. § 3553(a) .............................................................................17, 38

28 U.S.C. § 1291 .......................................................................................x

28 U.S.C. § 1331 ......................................................................................ix

28 U.S.C. § 2253(c)(1)(B).....................................................................ix, x

28 U.S.C. § 2255 .............................................................................ix, 1, 2

**Rules**

Fed. R. App. P. 4(a)(1)(B)(i) ..................................................................ix

vii

Fed. R. Evid. 702 ................................................................ 15, 22, 23, 25, 27

*Fed. R. Evid. 704(b) .................................................... 10, 15, 25, 26

## Other Authorites

USSG §1B1.3 ........................................................................ 1, 4, 10, 16, 33

USSG §1B1.3(a)(1)(A) ............................................................. 36–39

USSG Ch.5, Pt.A ..................................................................... 10, 11

## Statement of Jurisdiction

This is an appeal from a final order of the United States District Court for the Middle District of Florida denying Charles Friedlander's motion for collateral relief pursuant to 28 U.S.C. § 2255. Civ. Doc. 14.[1] The district court had jurisdiction. *See* 28 U.S.C. §§ 1331, 2255. The court denied the motion on November 30, 2012, Civ. Doc. 14, and entered judgment in the United States' favor on December 3, 2012, Civ. Doc. 15. Friedlander timely filed a notice of appeal on January 25, 2013. Civ. Doc. 18; *see* Fed. R. App. P. 4(a)(1)(B)(i). This Court subsequently granted him a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(1)(B) on the following three issues:

> (1)    Whether the district court erred in finding that Friedlander's trial counsel were not ineffective in their preparation of Dr. Frederick Berlin for a *Daubert*[2] hearing?
>
> (2)    Whether the district court erred in finding that Friedlander's trial counsel were not ineffective for failing to call Dr. Berlin as a witness at sentencing?
>
> (3)    Whether the district court erred in finding that Friedlander's appellate counsel were not ineffective for failing to challenge the use of uncharged conduct as "relevant conduct" for purposes of U.S.S.G. § 1B1.3?

Civ. Doc. 19. Accordingly, this Court has jurisdiction to address those issues.

---

[1] Friedlander's underlying criminal case is 8:08-cr-318-T-27TGW, and his section 2255 civil case is 8:12-cv-723-T-27TGW. Record citations in this brief will be designated "Crim. Doc." and "Civ. Doc.," respectively.

[2] *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993).

*See* 28 U.S.C. §§ 1291, 2253(c)(1)(B); *Murray v. United States,* 145 F.3d 1249, 1251 (11th Cir. 1998) ("[W]e will not decide any issue not specified in the COA.").

## Statement of the Issues

I.     Whether the district court erred in rejecting Friedlander's

argument that his attorneys had been ineffective in their preparation

of Dr. Berlin for the pretrial *Daubert* hearing in this case.

II.     Whether the district court erred in determining that

Friedlander's attorneys had not been ineffective in declining to

present largely cumulative mitigating evidence during Friedlander's

sentencing hearing.

III.     Whether the district court erred in determining that

Friedlander's counsel had not been ineffective in declining to

challenge on direct appeal the court's consideration of Friedlander's

uncharged communications with Detective Neil Spector as

"relevant conduct" for purposes of USSG §1B1.3.

## Statement of the Case

In this collateral proceeding pursuant to 28 U.S.C. § 2255, Friedlander

argues that his attorneys were constitutionally ineffective pretrial, during his

sentencing hearing, and on direct appeal. The district court rejected all of these

claims, and Friedlander now argues that the court erred in ruling as it did. For

the reasons explained in the *Argument* section of this brief, he is mistaken.

1

## *Course of Proceedings*

In July 2008, Friedlander was indicted for attempting to induce or entice a child to engage in sexual acts, in violation of 18 U.S.C. § 2422(b). Crim. Doc. 8. After he was convicted of this offense, the district court granted him a new trial. Crim. Docs. 158, 174. Friedlander was convicted during that trial too, and the court sentenced him to 360 months' imprisonment. Crim. Docs. 263, 289. On direct appeal, this Court affirmed his conviction and sentence. *United States v. Friedlander,* 395 F. App'x 577, 580–82 (11th Cir. 2010). Friedlander then filed a petition for writ of certiorari, which the Supreme Court denied on April 4, 2011. *Friedlander v. United States,* 131 S. Ct. 1833 (2011).

On April 3, 2012, Friedlander timely filed the motion pursuant to 28 U.S.C. § 2255 that provides the basis for this appeal. Civ. Doc. 1. He raised a host of issues challenging his attorneys' performance in connection with a pretrial *Daubert* hearing, during his second trial and sentencing hearing, and on direct appeal. Civ. Doc. 1 at 3–13.[3] After the United States responded in opposition, Civ. Doc. 6, and Friedlander replied, Civ. Docs. 12, 13, the district court issued a comprehensive, 45-page order rejecting all of his claims, Civ. Doc. 14.

---

[3]Pinpoint citations to the record in this brief refer to the pagination header the district court added upon filing.

2

Pertinent here (i.e., based on this Court's COA), the district court determined that Friedlander had not been prejudiced by any failure on the part of his attorneys to prepare Frederick S. Berlin, M.D., Ph.D., adequately for the *Daubert* hearing in this case because the evidence pertaining to internet fantasy that he sought to adduce would have been completely irrelevant and, therefore, inadmissible. Civ. Doc. 14 at 20. Based largely on the deference that is afforded an attorney's strategic decision about which witnesses to call at sentencing, the court also rejected Friedlander's argument that his attorneys had been ineffective in declining to either call Dr. Berlin as a witness during his sentencing hearing or have him prepare a supplemental expert report for the court's consideration prior to that hearing. Civ. Doc. 14 at 27. The court noted, however, that it had expressly considered Dr. Berlin's testimony during the pretrial *Daubert* hearing and Friedlander's first trial, as well as his November 9, 2008, expert report detailing his clinical impressions of Friedlander, in determining Friedlander's 360-month sentence. Civ. Doc. 14 at 27–28. But the court also concluded that Friedlander had suffered no prejudice as a result of this decision, as Dr. Berlin's proffered testimony and supplemental expert report would not have resulted in a lesser sentence. Civ. Doc. 14 at 28. Finally, the court determined that Friedlander's counsel had not been ineffective in declining to challenge on direct appeal the court's consideration of Friedlander's

3

uncharged communications with Detective Neil Spector as "relevant conduct" under USSG §1B1.3. Civ. Doc. 14 at 40–41.

This appeal followed. Civ. Doc. 18.

*Statement of the Facts*

**A.    *Offense and other relevant conduct***

This case arose out of an undercover investigation of sex crimes involving children conducted by Corporal Kurt Romanosky of the Pinellas County Sheriff's Office, who posed as a parent with minor children during online and other conversations with Friedlander. *See* Civ. Doc. 6-2 at 17–27. In July and August 2005, Friedlander participated in several internet chat room conversations with Corporal Romanosky (who was using the screen name "DunedinSuperDad"), during which Friedlander repeatedly alluded to deriving sexual gratification from beating minor children. *See* Civ. Doc. 6-2 at 17–19.[4]

In mid-February 2008, Friedlander approached another undercover officer in an internet chat room frequented by individuals with an interest in incest, Detective Neil Spector of the St. Lucie County Sheriff's Office, who was

---

[4]Portions of Friedlander's various online and other conversations with Corporal Romanosky were quoted extensively in the United States' response brief in his direct appeal, which the United States filed as an attachment to its response in opposition to his section 2255 motion. Civ. Doc. 6-2 at 17–27. That level of detail is neither necessary nor warranted in this collateral proceeding.

4

posing as a parent with two minor children and using the screen name "Travlndadfl."[5] Crim. Doc. 245 at 10, 25–27, 31–35, 68. Over the next four months, Friedlander had several online and telephone conversations with Detective Spector, during which he repeatedly discussed, in gut-wrenching detail, having sexual relations with the girl he believed was Detective Spector's 11-year-old, handicapped daughter. Crim. Doc. 245 at 25–26, 30, 44–67, 97–98. Friedlander also sent Detective Spector a picture of himself (which Detective Spector purportedly showed to his daughter to begin grooming her for the anticipated meeting with Friedlander, Crim. Doc. 245 at 46), and Detective Spector sent Friedlander two pictures of his fictitious daughter. Crim. Doc. 245 at 26, 29, 38–39, 73–74. Friedlander last conversed with Detective Spector on June 25, 2008. Crim. Doc. 245 at 81–82.

On June 16, 2008, Friedlander again approached Corporal Romanosky (who by this time was using the screen name "StricDad7" but still was posing as a parent with minor children) in an internet chat room frequented by individuals interested in sexually abusing children. *See* Civ. Doc. 6-2 at 19–20. During a

---

[5]Detective Spector testified on rebuttal during Friedlander's first trial (i.e., to counter Friedlander's assertion during his defense case that he was not sexually attracted to children). Crim. Doc. 245 at 9–11, 14–15, 24–91, 94–100. Friedlander rested without presenting a case during his second trial, Crim. Doc. 302 at 121, 159, so Detective Spector had no occasion to testify in that proceeding.

5

series of online conversations in June 2008, Friedlander related that he had regularly beaten his now-adult son and other minor children for sexual gratification.[6] *See* Civ. Doc. 6-2 at 20–23.

In early July 2008, Corporal Romanosky invited Friedlander to join him and a few other like-minded individuals at a planned gathering where his two young sons (ages 10 and 11) and other children would be available to beat and sexually abuse. *See* Civ. Doc. 6-2 at 23–24. Over the next two weeks, Friedlander and Corporal Romanosky had additional conversations, during which they discussed, in graphic detail, the parade of horribles that Friedlander had planned for the children. *See* Civ. Doc. 6-2 at 24–26.

A few days before the scheduled gathering, Friedlander went to his physician, who gave him samples of the erectile dysfunction drug, Levitra. *See* Civ. Doc. 6-2 at 27. On the morning of July 21, 2008, Friedlander traveled from his home in southwest Florida to meet Corporal Romanosky in St. Petersburg, Florida. *See* Civ. Doc. 6-2 at 21, 25, 27. Once there, he showed Corporal Romanosky the implements of torture that he had brought with him. *See* Civ. Doc. 6-2 at 27. At that point, authorities arrested Friedlander. *See* Civ. Doc. 6-2 at 27.

---

[6]As it turned out, Friedlander has no children. *See* Presentence Investigation Report ("PSR") at 10 ¶ 68.

6

While waiting for Corporal Romanosky to join him for a post-arrest interview, Friedlander muttered to himself: "I shouldn't have done it, should not have done it. It was stupid." *See* Civ. Doc. 6-2 at 28. During the ensuing interview, he told Corporal Romanosky that he frequented several internet chat rooms, including "strict parents," "fathers chatting," "unusual men for men," and "males for males started early." *See* Civ. Doc. 6-2 at 28. Although Friedlander maintained that he had no interest in physically or sexually abusing children, he stated—and then reiterated—that he had no idea what he would have done had the gathering proceeded as scheduled. *See* Civ. Doc. 6-2 at 28– 29.

During a subsequent search of Friedlander's home, authorities found (among other things) a notepad containing driving directions for Friedlander's rendezvous with Corporal Romanosky; a Levitra medication sample that was missing one tablet; and a suitcase containing multiple leather whips, belts, handcuffs, and other sex toys. *See* Civ. Doc. 6-2 at 29. But they found no child pornography or anything else that was illegal. *See* Civ. Doc. 6-2 at 29.

### B.     *The Daubert hearing*

On October 6, 2008, Friedlander's counsel retained Dr. Berlin—who is a board-certified psychiatrist and an attending physician at the Johns Hopkins Hospital—to provide expert testimony concerning pedophilia, sadomasochism,

7

and internet fantasy. Civ. Doc. 6-6 at 1 ¶ 3; Civ. Doc. 6-8 at 8; Civ. Doc. 12-1 at 2 ¶ 4. After reviewing the discovery in this case and meeting with Friedlander for several hours, Dr. Berlin issued a November 9, 2008, report opining that Friedlander was neither a pedophile nor a sexual sadist and that his various conversations with Corporal Romanosky had been nothing more than idle fantasy. Civ. Doc. 6-8 at 12–15; Civ. Doc. 12-1 at 2 ¶ 4.

On November 14, 2008 (a Friday), the district court conducted a hearing on several pending pretrial motions. Crim. Doc. 247. At the conclusion of this hearing, the court scheduled a *Daubert* hearing to determine the admissibility of Dr. Berlin's testimony for the following Monday afternoon. Crim. Doc. 247 at 147–49. Dr. Berlin was on call at the hospital on Saturday and Sunday, so he flew from Maryland to Florida Sunday afternoon and then met with Friedlander's counsel until 11:30 p.m. that night to prepare for the hearing. Civ. Doc. 6-6 at 2 ¶ 8; Civ. Doc. 6-6 at 8; Civ. Doc. 12-1 at 2 ¶ 6.

During the *Daubert* hearing, Dr. Berlin explained the clinical diagnostic criteria for pedophilia and sexual sadism and again opined that Friedlander's behavior in this case did not satisfy the criteria for either of these conditions. Crim. Doc. 248 at 11–15, 51–53. Dr. Berlin also testified about the prevalence of "fantasy" on the internet and again opined that the bulk of Friedlander's conversations with Corporal Romanosky had been nothing more than fantasy

8

conversations. Crim. Doc. 248 at 15–22, 58, 67. But he acknowledged (repeatedly) that there was no scientific test or peer-reviewed study that would substantiate his evaluation of these conversations; rather, that opinion was the product of his evaluation of the facts and circumstances of this case. Crim. Doc. 248 at 39–40, 42, 49, 58, 64. Dr. Berlin also explained that, unlike pedophilia and sexual sadism, which are psychological diagnoses, internet fantasy is simply a description of the manner in which people sometimes interact when communicating on the internet. Crim. Doc. 248 at 71, 74–76.

At the conclusion of this testimony, the district court found that Dr. Berlin was eminently qualified to testify as an expert in forensic psychiatry. Crim. Doc. 248 at 76. The court therefore determined that he would be permitted to testify about the diagnostic criteria for pedophilia and sexual sadism if those topics became an issue during Friedlander's trial. Crim. Doc. 248 at 96–99. The court further determined, however, that Dr. Berlin would not be permitted to opine whether Friedlander actually was or was not a pedophile or sexual sadist, as neither of those mental disorders bore on whether Friedlander actually had committed the charged child enticement offense. Crim. Doc. 248 at 97–99. The court also prohibited Dr. Berlin from testifying about the prevalence of "fantasy" on the internet, as that testimony was not based on any reliable scientific methodology or other testing and impermissibly addressed the

9

ultimate issue of Friedlander's intent, in contravention of Fed. R. Evid. 704(b). Crim. Doc. 248 at 77–78, 83–85, 95–96, 99.

### C.    *Pertinent facts concerning Friedlander's sentencing*

In Friedlander's PSR, the probation office recommended that the district court treat Friedlander's 2008 conversations with Detective Spector as "relevant conduct" under USSG §1B1.3. PSR Addendum at 1–3 ¶¶ 2, 5; PSR at 3–4 ¶¶ 16–17, 5–6 ¶ 24, 7–8 ¶¶ 39–45, 48. Prior to Friedlander's sentencing hearing, however, his counsel filed a memorandum objecting to this recommendation. Crim. Doc. 283 at 3–4 ¶ 9, 6 ¶ 9(e).

During the hearing that followed, Friedlander's counsel again objected to the district court's consideration of the Spector conversations as relevant conduct. Crim. Doc. 304 at 4–5, 36–39. The court ultimately overruled that objection, determining that this uncharged conduct—which qualified as an attempt to commit a child enticement offense and overlapped temporally the factually analogous offense conduct that provided the basis for Friedlander's child enticement conviction here—qualified as relevant conduct under sections 1B1.3(a)(1)(A) and (a)(3). Crim. Doc. 304 at 50–52. With a total offense level of 41 and a criminal history category of I, Friedlander's applicable guidelines range was 324 to 405 months' imprisonment. Crim. Doc. 304 at 54; *see* USSG Ch.5, Pt.A (Sentencing Table). The court noted, however, that disregarding the

10

Spector conversations would reduce Friedlander's total offense level to 40,

which would in turn reduce his applicable guidelines range to 292–365 months.

Crim. Doc. 304 at 54–55; *see* PSR ¶¶ 48, 51; USSG Ch.5, Pt.A. But the court

indicated that doing so would have no bearing on Friedlander's ultimate

sentence:

> I'm going to go ahead and make some findings and determinations.
> It would be easier … just to sustain the objection. I don't think as a
> practical matter it's going to make any difference. It does impact the
> guidelines, but overall under [section] 3553(a), I certainly can
> consider it.

Crim. Doc. 304 at 49–50.

When afforded the opportunity to argue in mitigation of Friedlander's

sentence, his attorneys offered into evidence Dr. Berlin's November 9, 2008,

letter detailing his clinical impressions of Friedlander. Crim. Doc. 304 at 56.

The court admitted and then reviewed this letter. Crim. Doc. 304 at 56. In the

letter (which was single-spaced and eight pages long), Dr. Berlin explained that

he had reviewed the discovery in this case and had met with Friedlander for

several hours, pointed out that there was no evidence that Friedlander had ever

abused a child, opined that Friedlander's various conversations with Corporal

Romanosky had been nothing more than harmless fantasy, and concluded that

11

Friedlander was not a danger to the community.[7] Civ. Doc. 6-8 at 8–15.

Before announcing Friedlander's sentence, the district court expressly noted that it had considered Dr. Berlin's testimony during the pretrial *Daubert* hearing and at Friedlander's first trial, as well as his November 2008 letter, in determining Friedlander's sentence. Crim. Doc. 304 at 79–80. But the court ultimately rejected Dr. Berlin's opinion that Friedlander's communications had been nothing more than fantasy:

> The letter and the testimony of Dr. Berlin was interesting in the first trial. And the letter I've read again today is interesting. He is imminently [sic] qualified. I was impressed … by his credentials and his background.
>
> He has opinions and he's entitled to those opinions. But I have to say I can't accept them. This wasn't just fantasy. You got in your car and you drove two and a half hours, or two hours to get up here. That's not fantasy. He engaged in a lot of fact finding in expressing opinions, and that's why, for the most part, much of his testimony was not going to be admissible.…
>
> But I've read his letter. I listened to his testimony very carefully. And, of course, we had an extensive *Daubert* hearing. And I just have to disagree with his opinions. The facts speak for themselves.

Crim. Doc. 304 at 79–80; *see also* Crim. Doc. 304 at 78 (explaining that Friedlander's conduct "was not mere discussions or chat or fantasy. That's nonsense. You got in your car with whips and razor straps, drove directly to St.

---

[7]Dr. Berlin made similar observations when he testified at the *Daubert* hearing. Crim. Doc. 248 at 11, 13–14, 20–22, 27–30, 36–44, 50–51, 56, 59, 63, 65, 69–70.

Petersburg, anticipating meeting with a 10 and 11-year-old boy to do despicable things and have them do things to you."), 81 (rejecting the assertion that Friedlander had no interest in children: "Your conduct belies that statement. This wasn't a matter of mere words, mere fantasy chat.").

Although Friedlander's counsel had urged the district court to impose a below-guidelines-range sentence, Crim. Doc. 304 at 70, the court explained why it had absolutely no intention of doing so:

> You pose a risk. Another factor … under the statute, Section 3553(a)[,] is protecting the public. Your conduct convinces me that, had you not been arrested, you posed a threat to other children, real children.
>
> The sentence I impose should reflect not only the seriousness of the offense, but promote respect for the law, deter others. Unfortunately, people who engage in this activity are not going to be deterred by sentences imposed, in my opinion.
>
> Whether you're a pedophile or not is not the issue. But those who are, those who would derive pleasure from images and videos of children being sexually and physically abused are not going to be deterred by this sentence. I hope that they are.
>
> Ultimately, the sentence should be just, it should be sufficient but not greater than necessary to achieve the statutory purposes of sentencing. This defendant faces an advisory guideline range of 27 years, minimum, if I do my math correctly….
>
> He faces a minimum mandatory sentence required by law of ten years. So, Mr. Friedlander, my decision is whether to impose a sentence at the minimum, which is ten years, or a sentence that truly reflects the conduct that you engaged in. I am mindful that any sentence I impose is likely to result in you dying in prison.…

13

> I am going to impose a sentence which I believe is called for, after considering Section 3553 (a), including the advisory guideline range, a sentence which I believe to be reasonable, a sentence which I believe to be sufficient but not greater than necessary to achieve the statutory purposes.
>
> A sentence at the minimum would not adequately reflect the seriousness of this offense. It would undermine respect for the law. It would certainly not deter others.

Crim. Doc. 304 at 83–85. The court then sentenced Friedlander to 360 months' imprisonment. Crim. Doc. 304 at 85.

## *Standard of Review*

Friedlander's claims challenging his attorneys' performance in the district court and on direct appeal present mixed questions of law and fact that this Court should review de novo. *See, e.g., Payne v. United States,* 566 F.3d 1276, 1277 (11th Cir. 2009).

## Summary of the Argument

I.    Even if Friedlander's attorneys had failed to prepare Dr. Berlin adequately for the pretrial *Daubert* hearing in this case (which is a disputed fact that cannot be resolved on the existing record), Friedlander suffered no prejudice as a result. First, because the record establishes that Dr. Berlin's proffered testimony on the prevalence of fantasy on the internet was based on his anecdotal observations rather than any scientific methodology, the district court correctly determined that the testimony failed to satisfy gatekeeping

14

requirements of Fed. R. Evid. 702 and *Daubert*. Indeed, this Court expressly affirmed that sound ruling in resolving Friedlander's direct appeal. The district court also correctly declined to permit Dr. Berlin to opine that Friedlander's conversations with Corporal Kurt Romanosky had been nothing more than idle fantasy, as that testimony would have established that Friedlander had never intended to commit the charged child enticement offense, which would have violated Fed. R. Evid. 704(b). Nor is there anything that Dr. Berlin could have said during the *Daubert* hearing that would have made relevant and admissible his opinion that Friedlander was not a pedophile or a sexual sadist. In these circumstances, Friedlander's first argument provides no basis for collateral relief.

II.    Friedlander's attorneys were not ineffective in declining to offer testimony or a supplemental expert report from Dr. Berlin during Friedlander's sentencing hearing, as that evidence would have been needlessly cumulative. In determining Friedlander's guidelines-range sentence, the district court expressly considered Dr. Berlin's November 2008 report detailing his clinical impressions of Friedlander, as well as his testimony during the pretrial *Daubert* hearing. And that evidence fully addressed the substance of Dr. Berlin's proffered supplemental testimony. In any event, based on Friedlander's damning offense conduct in this case, the court ultimately disagreed with Dr. Berlin's relatively

15

benign assessment of Friedlander, instead determining that the circumstances of this case demanded what is essentially a life sentence. Against this backdrop, there is no reasonable probability that the proffered additional evidence would have persuaded the court to impose a lesser sentence than it did. Friedlander's second argument, therefore, also provides no basis for collateral relief.

III.    Friedlander's counsel reasonably declined to challenge on direct appeal the district court's use of Friedlander's uncharged communications with Detective Neil Spector as "relevant conduct" under USSG §1B1.3, as such an argument would have been patently frivolous. First, this Court's controlling precedent forecloses Friedlander's argument that those conversations did not rise to the level of an attempt to commit a child enticement offense. Moreover, because some of those conversations occurred after Friedlander began engaging in the conversations with Corporal Romanosky that provide the basis for this case, they clearly qualified as relevant conduct under section 1B1.3(a)(1)(A).

But even if the district court's relevant-conduct ruling were in some way vulnerable (and it is not), that ruling had no bearing on Friedlander's ultimate sentence, so there still would have been no reason to challenge it on direct appeal. Although the court acknowledged that disregarding the Spector conversations would have reduced Friedlander's total offense level by one, the court expressly stated that it nonetheless would have considered those

16

conversations when weighing the 18 U.S.C. § 3553(a) sentencing factors in determining his sentence and ultimately would have imposed the same sentence. For this reason as well, it would have been fruitless to challenge on direct appeal the court's application of section 1B1.3, and Friedlander's counsel was not ineffective in declining to do so. Thus, Friedlander's third and final argument also provides no basis for collateral relief.

## Argument and Citations of Authority

As noted, this Court has issued a COA certifying three of Friedlander's seven ineffective-assistance-of-counsel claims for further review.[8] *See, e.g., Murray v. United States,* 145 F.3d 1249, 1251 (11th Cir. 1998) (COA defines and delimits scope of appeal in section 2255 proceeding). The Supreme Court established the legal framework for evaluating such claims almost 30 years ago in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

---

[8]In his brief at 11 n.2 and 53 n.12, Friedlander suggests in passing that this Court should expand the COA in this case to encompass additional issues. Because this Court, not the district court, issued the COA, it already has examined the record and determined the extent to which further consideration of the issues Friedlander raised on collateral review is warranted. There is no need for this Court to reconsider the wisdom of its prior determination at this late date.

17

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Of course, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065; *see, e.g., Rhode v. Hall,* 582 F.3d 1273, 1280 (11th Cir. 2009) ("[W]e must indulge a strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.") (quotation marks omitted). Thus, when analyzing an attorney's performance, a court must avoid "the distorting effects of hindsight" and must "evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065; *see, e.g., Rhode,* 582 F.3d at 1280 ("Our review is objective, in that we consider whether there was any reasonable justification for the attorney's conduct. Thus, the petitioner must establish that *no* competent counsel would have taken the action that his counsel did take.") (quotation marks omitted; emphasis added).

To establish prejudice under *Strickland,* a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. "The likelihood of a different result must be

18

substantial, not just conceivable." *Harrington v. Richter,* 131 S. Ct. 770, 792

(2011); *see also Strickland,* 466 U.S. at 693, 104 S. Ct. at 2067 ("It is not enough

for the defendant to show that the errors had some conceivable effect on the

outcome of the proceeding. Virtually every act or omission of counsel would

meet that test, and not every error that conceivably could have influenced the

outcome undermines the reliability of the result of the proceeding.") (citation

omitted). Notwithstanding Friedlander's assertions to the contrary in his brief at

37–39 and 42, this standard is "difficult to meet" and "requires proof of

unprofessional errors so egregious that the trial was rendered unfair and the

verdict rendered suspect," *Johnson v. Alabama,* 256 F.3d 1156, 1177 (11th Cir.

2001) (quotation marks omitted).[9]

   "Claims of ineffective assistance of appellate counsel are governed by the

same standards applied to trial counsel under *Strickland.*" *Brooks v. Comm'r, Ala.*

*Dep't of Corr.,* 719 F.3d 1292, 1300 (11th Cir. 2013) (quotation marks omitted).

---

[9]That being said (and as Friedlander in his brief at 37–39 points out), the
Supreme Court in *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068, observed that
the required showing is something less than a preponderance of the evidence:
"The result of a proceeding can be rendered unreliable, and hence the
proceeding itself unfair, even if the errors of counsel cannot be shown by a
preponderance of the evidence to have determined the outcome." *See also*
*Thompson v. Haley,* 255 F.3d 1292, 1300 (11th Cir. 2001) ("A 'reasonable
probability' need not be proof by a preponderance that the result would have
been different, but it must be a showing 'sufficient to undermine confidence in
the outcome.'") (quoting *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068).

19

Notably, "a criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal." *Payne v. United States,* 566 F.3d 1276, 1277 (11th Cir. 2009). This is so because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313 (1983). "Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues." *Payne,* 566 F.3d at 1277; *see also Smith v. Robbins,* 528 U.S. 259, 288, 120 S. Ct. 746, 765 (2000) (observing that while it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, … it is difficult to demonstrate that counsel was incompetent").

Applying these well-established principles to the facts of this case, Friedlander has failed to establish that he is entitled to collateral relief.

I.   **The district court correctly rejected Friedlander's argument that his counsel had been ineffective in their preparation of Dr. Berlin for the pretrial *Daubert* hearing in this case.**

Friedlander first argues that his attorneys failed to prepare Dr. Berlin adequately for the pretrial *Daubert* hearing in this case, which ultimately prejudiced his defense. Friedlander's brief at 30–39. Specifically, he contends

20

that if Dr. Berlin had been properly prepared, he could have brought publications to the hearing establishing that his proffered opinions concerning "[i]nternet culture and its impact on sexual behavior were grounded in statistical study and scientific methodology." Friedlander's brief at 32–33, 36 n.6. He also suggests that additional preparation would have enabled Dr. Berlin to testify in a manner that would have made admissible his proffered testimony that Friedlander did not meet the diagnostic criteria for pedophilia and sexual sadism. Friedlander's brief at 33, 36 n.6, 37, 39. He is mistaken.

Although the parties differed on their assessment of the extent and adequacy of Dr. Berlin's preparation for the *Daubert* hearing, *compare* Civ. Doc. 6-6 at 2 ¶¶ 8–9, *with* Civ. Doc. 12-1 at 2–5 ¶¶ 5–17, the district court ultimately concluded that it was unnecessary to resolve the dispute with an evidentiary hearing because Friedlander had failed to establish that he had been prejudiced by any deficiency in Dr. Berlin's preparation, Civ. Doc. 14 at 9, 20.[10] *See, e.g.,*

---

[10] Due to this factual dispute, it is not possible to resolve the performance prong of the *Strickland* analysis concerning this issue on the existing record. Friedlander's suggestion to the contrary in his brief at 33–34 and 43–44, is simply wrong. In any event, Friedlander's assertion in his brief at 31–32 that Dr. Berlin was unfamiliar with the *Daubert* standard because he had testified in state jurisdictions that still apply the "general acceptance" standard for the admission of expert testimony articulated by the D.C. Circuit in *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923), is, as the district court noted, Civ. Doc. 14 at 8 n.8, "not particularly persuasive." "[T]he *Frye* test was superseded by the adoption of the Federal Rules of Evidence [in 1975]," *Daubert,* 509 U.S. at 587, 113 S. Ct.

*Strickland,* 466 U.S. at 697, 104 S. Ct. at 2069 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Holladay v. Haley,* 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the [*Strickland*] test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong."). The record amply supports that sound ruling.

Under the Federal Rules of Evidence, an expert's testimony is admissible if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "'The task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand' is assigned to the district court." *United Fire and Cas. Co. v.*

---

at 2793, and Dr. Berlin has testified as an expert in federal court at least a dozen times, *see* Crim. Doc. 248 at 8.

*Whirlpool Corp.,* 704 F.3d 1338, 1341 (11th Cir. 2013) (quoting *Daubert,* 509 U.S. at 597, 113 S. Ct. at 2799; alteration omitted); *see also Daubert,* 509 U.S. at 589, 113 S. Ct. at 2795 ("[U]nder the [Federal Rules of Evidence,] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

In *Daubert,* 509 U.S. at 593–94, 113 S. Ct. at 2796–97, the Supreme Court identified several factors that a district court should consider when performing its general "gatekeeping" obligation before admitting expert testimony: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. But, "these factors are not exhaustive and are intended to be applied in a 'flexible' manner." *United Fire and Cas. Co.,* 704 F.3d at 1341 (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S. Ct. 1167, 1171 (1999)). The focus of the inquiry contemplated by Rule 702 and *Daubert* "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S. Ct. at 2797.

During the *Daubert* hearing, Dr. Berlin expressly (and repeatedly) acknowledged that his proffered testimony regarding the prevalence of fantasy

23

on the internet was not substantiated by any scientific methodology. *See, e.g.,* Crim. Doc. 248 at 39–40, 42, 49, 58. Rather, it was an anecdotal description of the manner in which people sometimes interact when communicating on the internet. *See, e.g.,* Crim. Doc. 248 at 39–40, 58, 71, 75–76. In these circumstances, the district court properly performed its gatekeeping function in excluding this testimony, Crim. Doc. 248 at 83–85, 95, 99. *See, e.g., Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1202 (11th Cir. 2010) ("In order to be admitted into evidence, [an expert's] opinions must … be based on a scientifically reliable methodology under *Daubert.*"); *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,* 582 F.3d 1227, 1232 (11th Cir. 2009) ("[I]f an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded.") (quoting *Daubert,* 509 U.S. at 592, 113 S. Ct. at 2796). Notably, on direct appeal, this Court expressly affirmed the district court's ruling on this issue in a decision explaining: "[T]he district court committed no error in precluding testimony about the prevalence of 'internet fantasy.' The court noted that the expert's opinion was unreliable as it was not based on the DSM IV or quantifiable scientific method."[11] *United States v. Friedlander,* 395 F.

---

[11]To the extent that Friedlander's brief at 36–37 (citing *United States v. Hofus,* 598 F.3d 1171 (9th Cir. 2010), *United States v. Grauer,* 805 F. Supp. 2d 698 (S.D. Iowa 2011), *United States v. Gladish,* 536 F.3d 646 (7th Cir. 2008), and *United States v. Joseph,* 542 F.3d 13 (2d Cir. 2008), and discussing the evidence in

App'x 577, 581 (11th Cir. 2010).

Although Friedlander in his brief at 32–33 and 35 argues that Dr. Berlin would have been able to discuss publications and pending studies addressing the prevalence of fantasy on the internet had he been more thoroughly prepared for the *Daubert* hearing, that testimony would have simply echoed Dr. Berlin's own anecdotal observations; it would not have converted them into a quantifiable scientific methodology. *See, e.g., Daubert,* 509 U.S. at 593, 113 S. Ct. at 2797 ("Publication … is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability.").

Even if Dr. Berlin's proffered internet-fantasy testimony had been able to clear the gatekeeping requirements of Rule 702 and *Daubert,* admission of that evidence would have violated Fed. R. Evid. 704(b), which provides:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Testimony that Friedlander's communications with Corporal Kurt Romanosky were nothing more than idle fantasy, if believed, would have established that

---

this case) may be read to challenge this decision, such a challenge would be beyond the scope of this collateral proceeding. *See, e.g., United States v. Nyhuis,* 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255.") (quotation marks and alteration omitted).

25

Friedlander had never intended to commit the charged child enticement offense. And, as the district court concluded, Crim. Doc. 248 at 78, 95–96, that would fall squarely within the purview of Rule 704(b)'s prohibition, *see, e.g., United States v. Manley,* 893 F.2d 1221, 1225 (11th Cir. 1990) (Rule 704(b) barred expert's opinion testimony on ultimate legal issue in case). Indeed, in his argument on this issue, Friedlander tacitly acknowledges that Dr. Berlin's proffered internet-fantasy testimony would have violated Rule 704(b). *See* Friedlander's brief at 30 (discussing need for expert testimony and noting, "it was apparent from the beginning that Dr. Friedlander's *mental state* would be a key issue") (emphasis added); *but see* Friedlander's brief at 36 n.6 (asserting that "Dr. Berlin would not have been called to testify about defendant's intent").

Nor is there anything that Dr. Berlin could have said or brought to the *Daubert* hearing that would have rendered admissible his opinion that Friedlander was neither a pedophile nor a sexual sadist. As the district court explained, Crim. Doc. 248 at 97–99, that proffered testimony was excluded because it had no bearing on whether Friedlander had actually committed the charged child enticement offense and, therefore, was not relevant. *See, e.g.,* 18 U.S.C. § 17(b) ("Mental disease or defect does not … constitute a defense."); *United States v. Wallenfang,* 568 F.3d 649, 660 (8th Cir. 2009) (affirming district court's exclusion of expert's proffered testimony in child pornography case that

defendant was not a pedophile); *United States v. Powers,* 59 F.3d 1460, 1471–73

(4th Cir. 1995) (same, in case involving sexual abuse of a minor). It was not

excluded in connection with the court's application of *Daubert* and Rule 702. As

a result, the adequacy of Dr. Berlin's preparation for the *Daubert* hearing played

no role in the court's determination that his testimony on this point was not

admissible.[12]

The district court, therefore, correctly determined that Friedlander had

not been prejudiced by any failure on the part of his attorneys to prepare Dr.

Berlin adequately for the pretrial *Daubert* hearing in this case. Civ. Doc. 14 at 20.

Accordingly, Friedlander's first argument provides no basis for collateral relief.

## II.    The district court correctly determined that Friedlander's attorneys had not been ineffective in declining to present largely cumulative mitigating evidence during Friedlander's sentencing hearing.

Friedlander next argues that his attorneys should have elicited additional

mitigating psychiatric evidence from Dr. Berlin during his sentencing hearing—

he contends that this evidence would have persuaded the district court to

impose something less than his existing 30-year sentence, perhaps even the

applicable 10-year, statutory-minimum penalty for his child enticement offense,

---

[12]Although the court excluded Dr. Berlin's testimony that Friedlander did not meet the diagnostic criteria for pedophilia or sexual sadism, it ruled that he would be permitted to testify about the diagnostic criteria for these conditions if the topics became an issue during Friedlander's trial. Crim. Doc. 248 at 96–99.

27

*see* 18 U.S.C. § 2422(b). Friedlander's brief at 39–43. The record belies this argument.

Determining which witnesses to call during a sentencing hearing "is the epitome of a strategic decision, and it is one that [this Court] will seldom, if ever, second guess." *Rhode,* 582 F.3d at 1284 (quotation marks omitted). Moreover, "it is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance of counsel claim simply by pointing to additional evidence that could have been presented." *Id.* (quotation marks and alteration omitted). Rather, in the sentencing context, a petitioner must show that there is "a reasonable probability" that admission of the proffered evidence would have persuaded the district court to impose a lesser sentence.[13] *See, e.g., Wong v. Belmontes,* 558 U.S. 15, 20, 130 S. Ct. 383, 386 (2009) (quotation marks omitted); *Suggs v. McNeil,* 609 F.3d 1218, 1229 (11th Cir. 2010) (same, quoting *Wong*).

Here, Friedlander argues that his attorneys should have permitted Dr. Berlin to provide additional testimony concerning the risk Friedlander posed to

---

[13]Friedlander in his brief at 42 characterizes the reasonable-probability standard as a "relatively low bar." As previously noted, however, that standard requires proof that is "sufficient to undermine confidence in the outcome of the proceeding," *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068, which is less than a preponderance of the evidence, *see, e.g., Thompson,* 255 F.3d at 1300, but still requires a significant showing, *see, e.g., Johnson,* 256 F.3d at 1177 (explaining that this standard is "difficult to meet" and "requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect") (quotation marks omitted).

the community, his potential for recidivism, and measures that could have been employed to allow him to be safely reintroduced into society. Friedlander's brief at 40–42. Friedlander's argument on this point includes no mention of it, *see generally* Friedlander's brief at 39–43, but Dr. Berlin did in fact address these areas of inquiry in his November 9, 2008, correspondence to Friedlander's counsel, which the district court admitted into evidence and expressly considered in determining Friedlander's sentence, Crim. Doc. 304 at 56, 79–80.

For example, observing that Friedlander had "led a productive, responsible, and caring … lifestyle" and did not have "a drug or alcohol problem that might disinhibit him, or compromise his judgment," Civ. Doc. 6-8 at 14, Dr. Berlin repeatedly opined that Friedlander's conversations with Corporal Romanosky had been nothing more than idle fantasy, *see, e.g.,* Civ. Doc. 6-8 at 11 (opining that these conversations "had been either a figment of Dr. Friedlander's imagination, or a request to engage in fantasy role-playing behavior, rather than a factual recounting of actual events"), 12 (stating that these conversations "would appear to have involved either pure fantasy, or some form of role-playing pretense"), 13 (determining that it would be "foolhardy to conclude that [Friedlander's] discussions about what he would have done with [Corporal Romanosky's] non-existent children had somehow, in his mind, been more about reality than fantasy"), 14 (opining that

29

Friedlander had simply been "express[ing] his sexuality and role-playing interests by means of fantasy 'chats'"), 14 (concluding that Friedlander had become "immersed in a world of Internet fantasy, and that his conversations about having whipped and beaten his own non-existent son, as well as the children of other non-existent persons, had simply been the product of such fantasizing"), 15 (positing that "Friedlander's discussions with the agent in question about beatings … had been much more about fantasy than reality").

Likewise, based on the absence of any evidence that Friedlander had ever actually abused a child, as well as the fact that authorities had discovered no child pornography on his computer when they analyzed it, Dr. Berlin further opined that Friedlander presented no risk to the community. *See, e.g.,* Civ. Doc. 6-8 at 12 ("to conclude that [Friedlander], … never before having either sexually or physically abused a child, … would have been prepared to actually do so with the undercover agent's non-existent children, constitutes nothing more than pure … speculation"), 12 ("the existence of [sexualized and non-sexualized fantasies], and role-playing, is by no means inevitably linked to an urge to engage in similar real-life activities"), 13 ("[I]n spite of his active fantasy life, his Internet persona, and his interest in role-playing, Dr. Friedlander is not a sexual sadist, and he is not a dangerous man."), 14 (opining that Friedlander "does not appear to have a psychiatric condition that would drive him to seek out a

30

real-life sexual encounter with a child"). Finally, Dr. Berlin made similar observations when he testified at the *Daubert* hearing. *See, e.g.,* Crim. Doc. 248 at 13–14, 20–22, 38–44, 50–51, 56, 59, 63, 65.

Although Dr. Berlin asserted in the district court that he had not "fully touched upon" these topic areas in his report and during the *Daubert* hearing, Civ. Doc. 12-1 at 6 ¶ 19, his proffered testimony adds little, if anything, to his prior opinions on these issues, *see* Civ. Doc. 12-1 at 6 ¶¶ 20–21 (observing lack of any evidence that Friedlander had ever engaged in similar "offending behavior," positing that stringent conditions of supervision and "supportive therapy" could have permitted him to live "at liberty with minimal risk to others," and opining that there would be little risk of recidivism after his release from a 10-year, statutory-minimum sentence). In any event, based on Friedlander's actual conduct in this case—i.e., driving more than two hours with implements of torture for a rendezvous with a man he believed was going to allow him to beat and sexually abuse two young children—the district court ultimately rejected Dr. Berlin's relatively benign assessment of Friedlander.[14] Crim. Doc. 304 at 78–81. The court then reasonably determined that the facts of

---

[14]It bears mentioning that the court's assessment is supported by Friedlander's own acknowledgement during his post-arrest interview with Corporal Romanosky that he had no idea what he would have done had the gathering proceeded as scheduled. *See* Civ. Doc. 6-2 at 28–29.

31

this case warranted, indeed required, a sentence ensuring that Friedlander

remains incarcerated for the rest of his life. Crim. Doc. 304 at 78–85.

Notably, despite Friedlander's comparatively advanced age (he was 79 at

the time of his sentencing, Crim. Doc. 304 at 81) and ill health, the district court

expressly rejected any notion that a 10-year, statutory-minimum sentence was

warranted:

> Ultimately, the sentence should be just, it should be sufficient but
> not greater than necessary to achieve the statutory purposes of
> sentencing. This defendant faces an advisory guideline range of 27
> years, minimum.…
>
> He faces a minimum mandatory sentence required by law of ten
> years. So, Mr. Friedlander, my decision is whether to impose a
> sentence at the minimum, which is ten years, or a sentence that
> truly reflects the conduct that you engaged in. I am mindful that any
> sentence I impose is likely to result in you dying in prison. Every
> lawyer in this room is mindful of that.
>
> I am going to impose a sentence which I believe is called for, after
> considering Section 3553(a), including the advisory guideline
> range, a sentence which I believe to be reasonable, a sentence which
> I believe to be sufficient but not greater than necessary to achieve
> the statutory purposes.
>
> A sentence at the minimum would not adequately reflect the
> seriousness of this offense. It would undermine respect for the law.
> It would certainly not deter others.

Crim. Doc. 304 at 84–85.

Against this backdrop, the district court correctly determined that

Friedlander had failed to meet his burden of establishing that he had been

32

prejudiced by his attorneys' decision not to elicit additional testimony from Dr. Berlin during Friedlander's sentencing hearing, Civ. Doc. 14 at 28. *See, e.g., Lee v. Comm'r, Ala. Dep't of Corr.,* 726 F.3d 1172, 1194–95 (11th Cir. 2013) (habeas petitioner not prejudiced by absence of largely cumulative mitigation evidence) (collecting cases); *Rhode,* 582 F.3d at 1287 ("Counsel is not required to present cumulative evidence."). Friedlander's second argument, therefore, also provides no basis for collateral relief.

### III. The district court correctly determined that Friedlander's counsel had not been ineffective in declining to challenge on direct appeal the court's consideration of Friedlander's uncharged communications with Detective Spector as "relevant conduct" under USSG §1B1.3.

Finally, Friedlander challenges on two grounds the district court's determination that his counsel was not ineffective in declining to argue on direct appeal that the court had erred in considering Friedlander's uncharged communications with another undercover officer, Detective Neil Spector, as "relevant conduct" under USSG §1B1.3. Friedlander's brief at 45–46, 49–53. Neither of his arguments establishes that the court erred in ruling as it did.

Relying on extra-circuit authority—but completely ignoring controlling precedent to the contrary—Friedlander first argues that his communications with Detective Spector did not rise to the level of an attempt to commit a child

33

enticement offense. Friedlander's brief at 49–50. To establish that Friedlander's

interactions with Detective Spector qualified as an attempt for purposes of

sentencing, the United States had to prove, by a preponderance of the evidence,

that Friedlander "(1) had the specific intent or mens rea to commit the [offense],

and (2) took actions that constituted a substantial step toward the commission of

[the] crime." *United States v. Yost,* 479 F.3d 815, 819 (11th Cir. 2007) (quotation

marks omitted); *see also United States v. Turner,* 626 F.3d 566, 572 (11th Cir. 2010)

("The government bears the burden of establishing by a preponderance of the

evidence the facts necessary to support a sentencing enhancement.") (quotation

marks omitted).

Here, Friedlander and Detective Spector (who was posing as a parent

with two minor children) first conversed in mid-February 2008, in an internet

chat room frequented by individuals with an interest in incest. Crim. Doc. 245

at 25–26, 31–35, 68. And, over a four-month period ending on June 25, 2008,

they had several additional conversations, during which Friedlander graphically

detailed his plan to have sexual relations with the girl he believed was Detective

Spector's 11-year-old, handicapped daughter. Crim. Doc. 245 at 25–26, 30, 44–

67, 81–82, 96–98. He also sent Detective Spector a picture of himself so that

Detective Spector could show it to the girl to begin grooming her for the

anticipated meeting. Crim. Doc. 245 at 26, 29, 38–39, 46, 52. This course of

34

conduct was more than sufficient to establish that Friedlander had indeed attempted to commit a child enticement offense with Detective Spector. *See, e.g., United States v. Rothenberg,* 610 F.3d 621, 625–27 (11th Cir. 2010) (determining that online chat room conversations alone qualified as substantial step toward commission of child enticement offense); *United States v. Lee,* 603 F.3d 904, 915 (11th Cir. 2010) (explaining that defendant's conversations with undercover officer detailing his plans to have sex with undercover officer's minor daughters "went beyond mere preparation, and constitute[d] a substantial step sufficient to support his attempt conviction") (quotation marks omitted).

Although Friedlander in his brief at 49–50 argues that his conversing with, and transmitting an image of himself to, Detective Spector did not rise to the level of a "substantial step" toward committing a child enticement offense, this Court has expressly rejected that very argument in factually analogous circumstances. *See, e.g., Rothenberg,* 610 F.3d at 625–27; *Lee,* 603 F.3d at 915. Because controlling precedent forecloses Friedlander's argument to the contrary, his counsel certainly was not ineffective in declining to make that argument on direct appeal. *See, e.g., Diaz v. Sec'y for the Dep't of Corr.,* 402 F.3d 1136, 1145 (11th Cir. 2005) ("[N]onmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel."); *Bolender v. Singletary,* 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure

35

to raise nonmeritorious issues does not constitute ineffective assistance.").

Nor does the record support Friedlander's argument that his counsel should have challenged on direct appeal the district court's use of his uncharged communications with Detective Spector as "relevant conduct" under section 1B1.3(a)(1)(A). Section 1B1.3(a)(1)(A) provides that a defendant's "relevant conduct" includes "all acts and omissions committed … by the defendant … that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." "This Court broadly interprets the provisions of the relevant conduct guideline," *United States v. Behr,* 93 F.3d 764, 765 (11th Cir. 1996), and "[u]ncharged conduct may constitute relevant conduct," *United States v. Valladares,* 544 F.3d 1257, 1268 (11th Cir. 2008).

As noted, here, Friedlander's various conversations with Detective Spector occurred over a four-month period beginning in mid-February 2008 and ending on June 25, 2008. Crim. Doc. 245 at 25, 30, 81–82. By that point, he already had begun conversing with Corporal Kurt Romanosky on June 16, 2008, and continued doing so until his arrest on July 21, 2008. *See* Civ. Doc. 6-2 at 19–27. Moreover, Friedlander's communications with Detective Spector and Corporal Romanosky had precisely the same objective: using internet chat rooms pandering to individuals interested in sexually abusing children to

36

connect with other like-minded adults willing to allow him to sexually abuse their children. *Compare* Crim. Doc. 245 at 25–26, 30, 44–67, 81–82, 96–98, *with* Civ. Doc. 6-2 at 19–27.

Based on the temporal relationship of these damning communications, the district court determined that the Spector conversations had occurred "during the commission of the offense of conviction" and, therefore, qualified as relevant conduct under section 1B1.3(a)(1)(A). Crim. Doc. 304 at 50–51. The court committed no error in ruling as it did. *See, e.g., United States v. Dunlap,* 279 F.3d 965, 966 (11th Cir. 2002) (applying "ordinary interpretation of the word 'during'" and holding that defendant's contemporaneous possession of child pornography would qualify as relevant conduct to his conviction for transmitting child pornography); *United States v. Nance,* 611 F.3d 409, 415–17 (7th Cir. 2010) (defendant's contemporaneous possession of older child pornography qualified as relevant conduct to his conviction for receiving child pornography, as defendant's "receipt and possession of child pornography violated the same statute and demonstrated his inclination toward sexually exploiting minors"); *United States v. Stulock,* 308 F.3d 922, 926 (8th Cir. 2002) (same).

Citing the Second Circuit's decisions in *United States v. Wernick,* 691 F.3d 108, 114–16 (2d Cir. 2012), and *United States v. Ahders,* 622 F.3d 115, 122 (2d

37

Cir. 2010), Friedlander asserts that his counsel should have argued on direct appeal that "temporal proximity and similarity are *not* enough to bring uncharged acts within the scope of relevant conduct." Friedlander's brief at 52–53. Like his first challenge to the district court's relevant-conduct determination, however, that argument would have been foreclosed by this Court's controlling precedent. *See Dunlap,* 279 F.3d at 966. Thus, Friedlander's counsel was not ineffective in declining to make this meritless argument, either. *See, e.g., Diaz,* 402 F.3d at 1145; *Bolender,* 16 F.3d at 1573.

In any event, even if the district court had erred in applying section 1B1.3(a)(1)(A) (which, for the reasons explained, it certainly did not), that error would have been harmless, as it had no bearing on Friedlander's ultimate sentence. During the sentencing hearing, the court explained that although Friedlander's total offense level would be reduced by one if his conversations with Detective Spector were not treated as relevant conduct under section 1B1.3(a)(1)(A), the court still would consider those conversations when it weighed the 18 U.S.C. § 3553(a) factors in determining his sentence. Crim. Doc. 304 at 49–50, 54–55. The court therefore indicated that such a ruling would not alter Friedlander's ultimate sentence:

> I'm going to go ahead and make some findings and determinations. It would be easier … just to sustain the objection. I don't think as a practical matter it's going to make any difference. It does impact the

38

guidelines, but overall under [section] 3553(a), I certainly can consider it.

Crim. Doc. 304 at 49–50. And later, before announcing Friedlander's 360-month sentence, the court explained that it intended to "impose a sentence … that truly reflects the conduct that [he had] engaged in," one that the court "believe[d] to be sufficient but not greater than necessary to achieve the statutory purposes" of sentencing. Crim. Doc. 304 at 84.

In light of the district court's alternative ruling, together with its explanation for Friedlander's 360-month sentence, it is clear that the court's relevant conduct determination ultimately had no bearing on his sentence. This is yet another reason why his counsel committed no error in declining to challenge that determination on direct appeal. *See, e.g., United States v. Amedeo,* 370 F.3d 1305, 1316–17 (11th Cir. 2004) (affirming defendant's sentence based on district court's alternative ruling).

For all of the foregoing reasons, the district court correctly determined that Friedlander's counsel had not been ineffective in declining to challenge on direct appeal the court's consideration of Friedlander's conversations with Detective Spector as relevant conduct under section 1B1.3(a)(1)(A). Consequent, Friedlander's third and final argument also provides no basis for collateral relief.

39

## Conclusion

Because none of the three questions this Court has certified provides a basis for granting Friedlander collateral relief, this Court should affirm the district court's judgment in this section 2255 proceeding.

Respectfully submitted,

A. LEE BENTLEY, III
Acting United States Attorney

SUSAN H. ROTHSTEIN-YOUAKIM
Assistant United States Attorney
Appellate Division

By:  _s/ Todd B. Grandy_
TODD B. GRANDY
Assistant United States Attorney
Appellate Division
Florida Bar No. 992674
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
todd.grandy@usdoj.gov

40

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 9550 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was sent by CM/ECF on November 26, 2013, to:

JONATHAN I. EDELSTEIN, ESQ.

*Counsel for Friedlander*

*s/ Todd B. Grandy*

TODD B. GRANDY
Assistant United States Attorney

gkpr/no/11/21/2013

b_Friedlander, Charles 2255 response brief tbg FINAL2.docx